No. 21-2472

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

CHARLES MACK,

*Plaintiff-Appellant,*

v.

JOHN YOST, ET AL.

*Defendants-Appellees.*

On Appeal from the United States District Court for the Western District of Pennsylvania, No. 3:10-cv-264-KRG (Gibson, J.)

## BRIEF OF *AMICI CURIAE* NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC., AND RIGHTS BEHIND BARS IN SUPPORT OF PLAINTIFF-APPELLANT

SAMUEL WEISS
RIGHTS BEHIND BARS
416 Florida Avenue NW,
#26152
Washington, DC 20001
(202) 455-4399

SAMUEL SPITAL
ADAM MURPHY
NAACP LEGAL DEFENSE
AND EDUCATIONAL
FUND, INC.
40 Rector St., 5th Floor
New York, NY 10006
(212) 965-2200

CHRISTOPHER KEMMITT
MICHAEL SKOCPOL
NAACP LEGAL DEFENSE
AND EDUCATIONAL
FUND, INC.
700 14th St. NW, Ste 600
Washington, DC 20005
(202) 682-1300

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Third Circuit Local Appellate Rule 26.1.1 and Federal Rule of Appellate Procedure 26.1, *amici curiae* hereby certify that they have no parent corporations and that no publicly held corporations own 10% or more of their stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT OF INTEREST OF AMICI CURIAE .............................................. 1

INTRODUCTION ................................................................................ 3

ARGUMENT ...................................................................................... 6

I.  Defendants Are Not Entitled to Qualified Immunity Because They Had Fair
    Warning That Their Conduct Was Unlawful. ............................................. 6

II. Defendants Are Not Entitled to Raise a Qualified Immunity Defense Under
    RFRA. ...................................................................................... 9

    A.  Qualified immunity's doctrinal foundations are Section 1983 and *Bivens*-
        specific. .............................................................................. 10

        i.  Qualified immunity's original justifications are particular to Section
            1983 actions against state officials. ............................................ 10

        ii. Qualified immunity was extended to certain claims against federal
            officials—all involving *implied* causes of action. ............................ 13

    B.  RFRA's express cause of action has no qualified immunity provision, and
        it would frustrate Congress's design to import one. ............................. 16

    C.  Even in the contexts where it already applies, modern qualified immunity
        doctrine has been widely criticized. ............................................. 23

CONCLUSION .................................................................................. 27

CERTIFICATE OF COMPLIANCE .............................................................. 29

CERTIFICATE OF BAR MEMBERSHIP ........................................................ 29

CERTIFICATE OF VIRUS SCAN .............................................................. 29

CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEFS ................................. 29

CERTIFICATE OF SERVICE ................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Pauley ex rel. Asatru/Odinist Faith Cmty. v. Samuels*,
No. 1:15-cv-158, 2019 WL 4600195 (W.D. Pa. Sept. 23, 2019) .......................21

*Bell v. Dean*,
No. 2:09-cv-1082, 2010 WL 2976752 (M.D. Ala. July 27, 2010) ....................23

*Bivens v. Six Unknown Named Agents of the Fed. Bureau of
Narcotics*,
403 U.S. 388 (1971) ................................................................................................13

*Brosseau v. Haugen*,
543 U.S. 194 (2004) (per curiam) ........................................................................6

*Buckley v. Fitzsimmons*,
509 U.S. 259 (1993) ...................................................................................11, 22

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) ...................................................................................16, 20

*Butz v. Economou*,
438 U.S. 478 (1978) ...............................................................................................13

*Crawford-El v. Britton*,
523 U.S. 574 (1998) (Scalia, J., dissenting) .......................................................26

*Davis v. Scherer*,
468 U.S. 183 (1984) ...............................................................................................14

*District of Columbia v. Wesby*,
138 S. Ct. 577 (2018) ..............................................................................................6

*Emp. Division v. Smith*,
494 U.S. 872 (1990) ...............................................................................................20

*Ferguson v. McDonough*,
13 F.4th 574 (7th Cir. 2021) .................................................................................1

*Forrester v. White*,
484 U.S. 219 (1988)........................................................................24

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982)...................................................................14, 15

*Harrison v. Watts*,
609 F. Supp. 2d 561 (E.D. Va. 2009) .........................................21

*Holt v. Hobbs*,
574 U.S. 352 (2015)........................................................................20

*Hope v. Pelzer*,
536 U.S. 730 (2002)...................................................................6, 7, 8

*Horvath v. City of Leander*,
946 F.3d 787 (5th Cir. 2020) (Ho, J., concurring)..................26

*Jacobs v. Cumberland Cnty.*,
8 F.4th 187 (3d Cir. 2021) .................................................*passim*

*Jamison v. McClendon*,
476 F. Supp. 3d 386 (S.D. Miss. 2020) (Reeves, J.) ................27

*Kane v. Barger*,
902 F.3d 185 (3d Cir. 2018) ...........................................................7

*Kisela v. Hughes*,
138 S. Ct. 1148 (2018) (Sotomayor, J., dissenting)................26

*Lamie v. U.S. Trustee*,
540 U.S. 526 (2004)........................................................................19

*Lyng v. Nw. Indian Cemetery Protective Ass'n.*,
485 U.S. 439 (1988)..........................................................................8

*Malley v. Briggs*,
475 U.S. 335 (1986)...................................................................11, 22, 23

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) ......................................................26

*The Marianna Flora*, 24 U.S. (11 Wheat.) 1 (1826) ......................25

*Monroe v. Pape*,
365 U.S. 167 (1961).................................................................10, 22

*O'Connor v. Donaldson*,
422 U.S. 563 (1975).......................................................................12

*Owen v. City of Independence*,
445 U.S. 622 (1980).................................................................11, 24

*Patsy v. Bd. of Regents of Fla.*,
457 U.S. 496 (1982).......................................................................10

*Pierson v. Ray*,
386 U.S. 547 (1967).................................................................11, 22

*Procunier v. Navarette*,
434 U.S. 555 (1978).......................................................................12

*Rasul v. Myers*,
563 F.3d 527 (D.C. Cir. 2009) (per curiam).....................................21

*Richardson v. McKnight*,
521 U.S. 399 (1997).......................................................................24

*Romero v. Lappin*,
No. 10-cv-35, 2011 WL 3422849 (E.D. Ky. Aug. 4, 2011).............21

*Safford Unified Sch. Dist. No. 1 v. Redding*,
557 U.S. 364 (2009).........................................................................7

*Samuel v. Holmes*,
138 F.3d 173 (5th Cir. 1998) ..........................................................23

*Scheuer v. Rhodes*,
416 U.S. 232 (1974).................................................................12, 24

*Schneyder v. Smith*,
653 F.3d 313 (3d Cir. 2011) ......................................................5, 6, 7

*Sherbert v. Verner*,
374 U.S. 398 (1963).........................................................................8

*Tanzin v. Tanvir*,
   141 S. Ct. 486 (2020).............................................................16, 18, 19

*Taylor v. Riojas*,
   141 S. Ct. 52 (2020) (per curiam).............................................1, 6, 7

*Thacker v. Tenn. Valley Auth.*,
   139 S. Ct. 1435 (2019)....................................................................17

*United States v. Lanier*,
   520 U.S. 259 (1997)...........................................................................6

*Vette v. Sanders*,
   989 F.3d 1154 (10th Cir. 2021) ........................................................1

*Whitman v. Am. Trucking Ass'ns, Inc.*,
   531 U.S. 457 (2001).........................................................................19

*Wilkie v. Robbins*,
   551 U.S. 537 (2007).........................................................................18

*Williams v. Bitner*,
   455 F.3d 186 (3d Cir. 2006) .......................................................5, 6, 7

*Wood v. Strickland*,
   420 U.S. 308 (1975).........................................................................12

*Wyatt v. Cole*,
   504 U.S. 158 (1992) (Kennedy, J., concurring) .............................26

*Zadeh v. Robinson*,
   902 F.3d 483 (5th Cir. 2018) (Willett, J., concurring) ...................26

*Ziglar v. Abbasi*,
   137 S. Ct. 1843 (2017)...............................................................*passim*

## Statutes

28 U.S.C.A. §§§ 2679, 2671, 2680 ........................................................17

28 U.S.C. § 2680 ....................................................................................17

31 U.S.C. § 3730(h) ...............................................................................23

42 U.S.C. § 1983 .................................................................................*passim*

42 U.S.C. § 2000bb ...........................................................................20

42 U.S.C. § 2000bb–1(a) ..................................................................19

42 U.S.C § 2000bb–1(b) ...............................................................8, 20

42 U.S.C. § 2000bb–1(c) ..................................................................20

42 U.S.C. § 2000bb(b) .......................................................................16

42 U.S.C. § 2000bb(b)(1) .................................................................20

## Other Authorities

Diana Hassel, *Excessive Reasonableness*, 43 Ind. L. Rev. 117 (2009) ..................27

Ilan Wurman, *Qualified Immunity and Statutory Interpretation*, 37
    Seattle U. L. Rev. 939 (2014) ............................................................13

Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 Notre
    Dame L. Rev. 1797 (2018) ..........................................................25, 27

Joanna C. Schwartz, *Police Indemnification*, 89 N.Y.U. L. Rev. 885
    (2014) ....................................................................................24, 25

John S. Jeffries, Jr., *The Right-Remedy Gap in Constitutional Law*,
    109 Yale L.J. 89 (1999) ...................................................................27

Katherine Mims Crocker, *Qualified Immunity and Constitutional
Structure*,
    117 Mich. L. Rev. 1405 (2019) .........................................................14

Margo Schlanger, *Inmate Litigation*, 116 Harv. L. Rev. 1555 (2003) ..................25

*Qualified Immunity: A Legal, Practical, and Moral Failure*, Cato Inst.
    (Sept. 14, 2020), https://www.cato.org/policy-analysis/qualified-
    immunity-legal-practical-moral-failure ............................................27

*Qualified Immunity*, Equal Just. Initiative,
    https://eji.org/issues/qualified-immunity (last visited Nov. 8, 2021) ..................27

William Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45
(2018) ...............................................................................10, 25, 27

William N. Eskridge, Jr., *Public Values in Statutory Interpretation*,
137 U. Pa. L. Rev. 1007 (1989)............................................11, 12, 22

# STATEMENT OF INTEREST OF AMICI CURIAE[1]

The NAACP Legal Defense & Educational Fund, Inc. (LDF) strives to secure equal justice under the law for all Americans, and to break down barriers that prevent African Americans from realizing their basic civil and human rights. LDF has a longstanding concern with the doctrine of qualified immunity, which denies redress to deserving civil rights plaintiffs and insulates government officials from the consequences of their unconstitutional behavior. LDF's recent advocacy in this area includes representing plaintiffs in direct appeals including *Ferguson v. McDonough*, 13 F.4th 574 (7th Cir. 2021), and *Vette v. Sanders*, 989 F.3d 1154 (10th Cir. 2021), and filing amicus briefs in other cases, including *Taylor v. Riojas*, 141 S. Ct. 52 (2020) (per curiam).

Amicus curiae Rights Behind Bars ("RBB") legally advocates for people in prison to live in humane conditions and contributes to a legal ecosystem in which such advocacy is more effective. RBB seeks to create a world in which people in prison do not face large structural obstacles to effectively advocating for themselves in the courts. RBB helps incarcerated people advocate for their own interests more

---

[1] This brief has not been authored, in whole or in part, by counsel to any party in this appeal. No party or counsel to any party contributed money intended to fund preparation or submission of this brief. No person, other than the *amici* or their counsel, contributed money that was intended to fund preparation or submission of this brief. Plaintiff-Appellant and Defendants-Appellees consented to the filing of this brief.

effectively and through such advocacy push towards a world in which people in prison are treated humanely.

**INTRODUCTION**

This appeal turns on two recurring misunderstandings about qualified immunity that lead courts to misapply the defense and contravene its core purposes and justifications. The first is the common fallacy that law is "clearly established" for purposes of qualified immunity *only* when a case with indistinguishable facts is already on the books. That misunderstanding led the district court to let these Defendants escape liability for illegal conduct simply because that misconduct was unusually brazen, even though any reasonable officer in their shoes would have known that they were breaking the law. The second is the misapprehension that qualified immunity is a free-floating defense of universal applicability, to which black-letter principles of statutory interpretation and judicial restraint do not apply. That mistaken premise led the district court to unknowingly undertake an unwarranted extension of the qualified immunity doctrine.

That latter error—which the bulk of this brief addresses, in Part II—relates to an often-overlooked issue that is unresolved in the Third Circuit: does qualified immunity extend to express statutory causes of action outside the heartland of Section 1983 and *Bivens* where the doctrine originated? The key point is that the Supreme Court has *never* endorsed applying qualified immunity to modern legislation like the Religious Freedom Restoration Act (RFRA), whose statutory text contains a freestanding and express cause of action for individual damages. The

Supreme Court has only applied the doctrine in three limited and interconnected contexts: the broad universe of claims that arise under 42 U.S.C. § 1983 (Section 1983); claims under the parallel, judicially implied *Bivens* cause of action; and a tiny handful of similar judicially implied statutory causes of action. By implying qualified immunity into a modern statute that Congress chose to imbue with an express and unqualified cause of action for damages, the district court's decision to entertain the defense in a RFRA action overstepped the judicial role and upended important separation of powers principles.

Extending the doctrine to RFRA would also overlook important differences between RFRA and Section 1983, where qualified immunity originated and is typically applied. The Supreme Court relied on Section 1983's broad contours and unique history in grafting a common law-inspired defense onto Section 1983. But the judiciary has no comparable latitude when it comes to RFRA, a modern statute characterized by exacting text, a specific purpose, and a lone carefully calibrated textual exception at its heart. Congress enacted RFRA to correct a perceived underenforcement of religious freedoms, and it accordingly guarantees *more* protection than ordinary constitutional litigation would afford. It defies Congress's design to imply into this statute a sweeping immunity carve-out that would nullify that guarantee in a broad swath of cases. Stretching a widely condemned and

disfavored doctrine is inconsistent with Supreme Court precedent, especially when doing so would nullify the letter and spirit of legislative action.

The district court's more basic error—misunderstanding qualified immunity doctrine to require matching facts—is one this Court has expounded on before. *See, e.g.*, *Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 196–97 (3d Cir. 2021); *Schneyder v. Smith*, 653 F.3d 313, 329–30 (3d Cir. 2011); *Williams v. Bitner*, 455 F.3d 186, 191–94 (3d Cir. 2006). As we begin by explaining in Part I, the district court misapplied settled law when it granted immunity for the plainly illegal conduct at issue here. The district court reasoned that it could not find a prior case quite like this one—where Defendants suppressed the plaintiff's religious exercise through a campaign of harassment and cruelty that even included a prison guard telling Charles Mack, the Muslim Plaintiff in this case, "there is no good Muslim except a dead Muslim." But qualified immunity is not a spot-the-difference logic game. It simply requires that government officials have fair warning their conduct is illegal. That a court has never considered whether religiously motivated bullying from prison guards like "there is no good Muslim except a dead Muslim" burdens free exercise or comports with strict scrutiny is a testament to the easiness of the legal question, not its difficulty. If the fair warning test cannot be satisfied in egregious outlier cases, then the qualified immunity defense will be most insurmountable where it least belongs.

**ARGUMENT**

## I.   Defendants Are Not Entitled to Qualified Immunity Because They Had Fair Warning That Their Conduct Was Unlawful.

The doctrine of qualified immunity requires that officers be provided fair warning before a court may hold them liable for constitutional violations. While fair warning is most often provided by factually similar precedent clearly establishing the unlawfulness of the conduct, an official's conduct may also be so "obvious[ly]" illegal that no such "body of relevant case law" is necessary. *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam) (applying the holding of *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)). In other words, conduct may be clearly unconstitutional even if "the very action" has not "previously been held unlawful." *United States v. Lanier*, 520 U.S. 259, 270–71 (1997); *accord Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 196 (3d Cir. 2021); *Schneyder v. Smith*, 653 F.3d 313, 330 (3d Cir. 2011); *Williams v. Bitner*, 455 F.3d 186, 192 (3d Cir. 2006).

The Supreme Court has recently and repeatedly reaffirmed that defendants whose conduct is obviously unconstitutional are ineligible for qualified immunity, even on novel facts. *See, e.g.*, *Taylor v. Riojas*, 141 S. Ct. 52, 54 (2020) (per curiam) (reversing a grant of qualified immunity where "the particularly egregious facts" meant that "any reasonable officer should have realized" their conduct was unlawful); *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (reiterating that unlawfulness can be clearly established "even though existing precedent does

not address similar circumstances"). This Court, too, has long made clear that qualified immunity is unavailable for conduct "so patently violative . . . that reasonable officials would know without guidance from a court." *Schneyder v. Smith*, 653 F.3d at 330; *see also, e.g.*, *Kane v. Barger*, 902 F.3d 185, 195 (3d Cir. 2018) ("The right here is so 'obvious' that it can be deemed clearly established even without materially similar cases."); *Williams*, 455 F.3d at 191.

This obviousness principle follows directly from the core rationale of qualified immunity: ensuring that defendants have fair notice before they are held liable. *See Hope*, 536 U.S. at 739–40 & n.10; *Taylor*, 141 S. Ct. at 54; *Jacobs*, 8 F.4th at 196. Patently unconstitutional conduct is by its nature less likely to lead to the development of precedent to serve as clearly established law. *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377–78 (2009). Because such conduct is obviously unconstitutional, officials are—or should be—less likely to perpetrate it. "[O]utrageous conduct obviously will be unconstitutional, this being the reason . . . that the easiest cases don't even arise." *Id.* (internal quotation marks and brackets omitted)). If the law were otherwise, the most flagrant rights violators would be the most immune.

The district court lost sight of this principle when it granted qualified immunity here. No reasonable correctional officer would have thought that it was permissible to taunt a Muslim man under his custody that "there is no good Muslim

except a dead Muslim"; physically slap onto his back a sticker that says, "I love pork bacon"; kick over boxes to disrupt his prayers; and then fire him from his job because of his religion. 1 J.A. 9–10. The "obvious cruelty inherent in" this alleged conduct should have put defendants on notice that their actions violated Mack's rights. *See Hope*, 536 U.S. at 745; *Jacobs*, 8 F.4th at 197 (applying *Hope* to hold that "gratuitous" abuse "divorced from any legitimate penological purpose" is clearly unlawful). To put common sense in RFRA terms, it was obvious that Defendants' campaign of harassment and pretextual termination "substantially burden[ed]" Mr. Mack's exercise of his religion, and that their conduct could not further *any* legitimate "governmental interest" (much less a "compelling" one). 42 U.S.C § 2000bb–1(b).

Instead of applying the obviousness principle, the district court granted qualified immunity because at the time Defendants bullied and harassed Mr. Mack, the relevant case law did not specifically address the substantial burdens caused by overt religiously motivated bullying and harassment, and instead focused on dietary restrictions that substantially burdened prisoners' religion. 1 J.A. 15. But Supreme Court precedent in *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)—the very case RFRA codified—and in *Lyng v. Nw. Indian Cemetery Protective Ass'n.*, 485 U.S. 439, 450 (1988), had long established that even "incidental interference" and "indirect coercion" that prohibit the free exercise of religion violated the First

Amendment. The Defendants' conduct here plainly violated these established legal principles and went well beyond "indirect coercion" or "incidental interference."

The district court readily acknowledged that a "different result would, of course, be reached if the conduct at issue were to have occurred today." 1 J.A. 16 n.8. But in granting qualified immunity on such a hairsplitting basis, the court ignored the simple fact that this is *not* an edge case; the glaring illegality of Defendants' conduct placed it "nowhere near the hazy border" where qualified immunity is meant to apply, in 2009 no less than today. *See Jacobs*, 8 F.4th at 197 (citation and quotation marks omitted). Defendants had fair warning that their conduct was illegal. For that reason, they are not entitled to qualified immunity.

## II. Defendants Are Not Entitled to Raise a Qualified Immunity Defense Under RFRA.

There is another, more fundamental, reason why qualified immunity should be denied in this case: Qualified immunity is not available under RFRA. RFRA is a modern statute intended to provide robust protection for civil rights that nowhere mentions the sweeping defense, which would undermine its text and purpose. Because the historical evolution of the qualified immunity doctrine provides important context for understanding why the district court erred on this point, we begin by reviewing key aspects of the doctrine's origins in Section 1983 and subsequent expansion to *Bivens* and related causes of action. We later conclude by

highlighting some recent criticisms of the doctrine that confirm the wisdom of declining to extend it into this new domain.

### A. Qualified immunity's doctrinal foundations are Section 1983 and *Bivens*-specific.

#### i. Qualified immunity's original justifications are particular to Section 1983 actions against state officials.

The story of qualified immunity begins with Section 1983. During Reconstruction, Congress enacted the provision of the Civil Rights Act of 1871 now codified at 42 U.S.C. § 1983. Aiming to "combat lawlessness and civil rights violations in the southern states," William Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45, 49 (2018), Section 1983 created an open-ended statutory vehicle for enforcing federal law that granted federal courts new and previously unheard-of power over state officials. *See Monroe v. Pape*, 365 U.S. 167 (1961); *Patsy v. Bd. of Regents of Fla.*, 457 U.S. 496, 503 (1982). This revolutionary extension of federal power occurred at a time when the common law and common-law modes of judging were ascendant. *See* Guido Calabresi, A Common Law for the Age of Statutes 1 (1982) (noting American law's modern evolution away "from a legal system dominated by the common law"). Section 1983 effectively created an open-ended system of "supplementary" federal constitutional torts, *see Monroe*, 365 U.S. at 183, one that was "directly analogous to an arena of vast common law experience,"

William N. Eskridge, Jr., *Public Values in Statutory Interpretation*, 137 U. Pa. L. Rev. 1007, 1054 (1989).

The defense to Section 1983 claims that we now know as "qualified immunity" grew out of that history. The common law of 1871 permitted police officers to defend against a tort claim for false arrest or false imprisonment by showing that "they acted in good faith and with probable cause." *Pierson v. Ray*, 386 U.S. 547, 555 (1967). In 1967, the Supreme Court started down the path to modern qualified immunity doctrine when it first recognized an analogous defense to a Fourth Amendment claim under Section 1983. It reasoned that if Congress in 1871 had meant to foreclose established common-law defenses, someone presumably would have mentioned that expectation somewhere in the legislative debates. *See id.* at 554–55. In other words, the justification for qualified immunity turned on whether a comparable common-law defense was "well established in 1871, when § 1983 was enacted." *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993)). In the Court's view, historical expectations from the time Section 1983 was enacted, and the Court's interpretation of the statute's legislative history, justified the anomalous act of reading a defense into a statute that "on its face does not provide for any immunities." *Malley v. Briggs*, 475 U.S. 335, 342 (1986); *accord Owen v. City of Independence*, 445 U.S. 622, 635 (1980).

The Court subsequently extended the defense to Section 1983 actions against the full range of state and local officials in *Scheuer v. Rhodes*, 416 U.S. 232 (1974) and other cases.[2] *Scheuer* represented a significant early expansion of the doctrine, declaring the defense applicable to the entire executive branch of a state government, including "higher officers." 416 U.S. at 246. That case reemphasized the defense's foundations in the legislative history of Section 1983 and historical common law. *See id.* at 243–45. And while explicit "policy consideration[s]" began playing a role from that point forward, *Scheuer* still justified making the defense more broadly available within the bounds of Section 1983 in part by analogizing to "the somewhat parallel context of the privilege of public officers from [common law] defamation actions." *See id.* at 241–42.

That is how qualified immunity became a "special exemption from the categorical remedial language of Section 1983." *Wood*, 420 U.S. at 322. This reasoning bears little resemblance to interpretation of RFRA and other contemporary statutes, which requires disciplined adherence to statutory text. That is because Section 1983 is an "older, generally worded" statute that Congress "substantially left to Courts to develop," which "resulted in an unusual amount of gapfilling based upon common law values." Eskridge, *supra*, at 1052, 1054. Thus, even absent any specific

---

[2] *See Wood v. Strickland*, 420 U.S. 308, 318 (1975) (local school administrators); *O'Connor v. Donaldson*, 422 U.S. 563 (1975) (superintendent of a state hospital); *Procunier v. Navarette*, 434 U.S. 555 (1978) (state prison administrators).

grounding in the text of Section 1983, the foundational qualified immunity jurisprudence remained rooted in Section 1983's particular purpose and history. *See* Ilan Wurman, *Qualified Immunity and Statutory Interpretation*, 37 Seattle U. L. Rev. 939, 953–54 (2014).

### ii. Qualified immunity was extended to certain claims against federal officials—all involving *implied* causes of action.

While qualified immunity was taking shape under Section 1983, the Supreme Court recognized an analogous damages remedy for constitutional violations committed by *federal* officials. *See Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). Like the qualified immunity defense under Section 1983, the court-crafted *Bivens* cause of action was not grounded in statutory text—or indeed in any congressional legislation at all. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854–57 (2017).

The Supreme Court extended qualified immunity to this new *Bivens* context in *Butz v. Economou*, 438 U.S. 478 (1978). Fine-tuning a remedy of its own design, the Court in *Butz* pursued the explicit policy goal of calibrating *Bivens* to parallel Section 1983 as closely as possible. *See id.* at 496–504. It was "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." *Id.* at 504. *Butz* was the first time the Court applied qualified immunity outside the bounds of Section 1983.

Then came *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), another *Bivens* case, which turned out to be an important milestone in the evolution of qualified immunity. Using the explicitly policy-driven reasoning characteristic of *Bivens*, the Court eliminated part of the defense that had previously required subjective good faith by the defendant. *Harlow*'s new qualified immunity defense turned solely on "the objective reasonableness of an official's conduct, as measured by reference to clearly established law." *Id.* at 818.

With *Butz* having stated that daylight between *Bivens* and Section 1983 would be "untenable," the new purely objective conception of the defense boomeranged back to Section 1983. *See Davis v. Scherer*, 468 U.S. 183, 194 n.12 (1984) (citing *Butz*); Katherine Mims Crocker, *Qualified Immunity and Constitutional Structure*, 117 Mich. L. Rev. 1405, 1432–33 (2019). Ever since, the qualified immunity test outlined by *Harlow* "has remained the analytical reference point" for the muscular version of the defense that prevails in both contexts today. *Id.* at 1414. That refashioning of the defense is *Harlow*'s focus and primary legacy.

But one peripheral feature of *Harlow* matters here, too. Although *Harlow* focused almost exclusively on a constitutional *Bivens* claim, the underlying suit also involved two additional claims derived from two disparate federal statutes: 18 U.S.C. § 1505, a criminal statute prohibiting obstruction of Congressional testimony, and 5 U.S.C § 7211, which "provides generally that the right of employees to furnish

information" to Congress "may not be interfered with or denied." *Harlow*, 457 U.S. at 805 & n.10 (internal quotation marks and alterations omitted). As *Harlow* emphasized, "Neither [statute] expressly create[d] a private right to sue for damages." *Id.* at 805 n.10. So, any claimed causes of action would necessarily have to be implied into the statute by the court—much like the *Bivens* remedy. Such implied statutory causes of action were rapidly falling out of favor at this time, *see Ziglar*, 137 S. Ct. at 1855–56, and indeed the *Harlow* court viewed these claimed causes of action skeptically, *see* 457 U.S. at 820 n. 36. Nevertheless, their presence led the Court in *Harlow* to describe qualified immunity as protecting government officials "insofar as their conduct does not violate clearly established *statutory or* constitutional rights of which a reasonable person would have known." *Id.* at 818 (emphasis added).

Relying on this "statutory or constitutional" formulation from *Harlow*, some lower courts have treated qualified immunity as a defense that is broadly applicable throughout the entire United States Code, regardless of the nature of the statute or cause of action at issue. *See infra*, at 21–22. But neither *Harlow* nor any other precedent that binds this Court supports such a sweeping reconceptualization of qualified immunity. In fact, the Supreme Court has only applied the doctrine in the specific, readily explicable contexts described here: first and foremost, the wide range of claims against state officials that may arise under Section 1983 itself; next,

claims against federal officials arising under the judicially crafted *Bivens* remedy; and finally, the two *Bivens*-like implied statutory causes of action in *Harlow*. The Supreme Court has never endorsed applying qualified immunity to a federal statute in which Congress conferred a freestanding *express* cause of action.

### B. RFRA's express cause of action has no qualified immunity provision, and it would frustrate Congress's design to import one.

Now consider RFRA. RFRA is a modern statute first enacted in 1993 and most recently revised to apply only to the federal government in 2000. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693–96 (2014). It has the express purpose of providing greater and more exacting protection from government interference with the free exercise of religion than the First Amendment alone provides. *See* 42 U.S.C. § 2000bb(b). And unlike any statute to which the Supreme Court has ever extended qualified immunity, its text expressly provides a cause of action to recover individual-capacity damages from federal officials who violate the statute. *See Tanzin v. Tanvir*, 141 S. Ct. 486 (2020).[3]

What RFRA does *not* include anywhere in its text is a qualified immunity defense to that cause of action. That silence speaks volumes. If Congress had wanted

---

[3] Congress authorized individual-capacity damages under RFRA's private cause of action by conferring a right to obtain any "appropriate relief"—including damages— "against a government," while also specifying that individual federal officers are included in the statutory definition of "government." *Tanzin*, 141 S. Ct. at 489–90.

to limit the scope of the remedy it was creating with a broad immunity exception, it would have said so.

That is the lesson of other modern legislation through which Congress, exercising its power of the purse, has sought to provide compensation for individuals harmed by the federal government. In other contexts where Congress has expressly made damages recoverable from the federal government or its agents, it specifies exceptions and defenses that should be available and expects courts to hew to those judgments. *See, e.g.*, 28 U.S.C.A. §§§ 2679, 2671, 2680. For example, the Federal Tort Claims Act—which provides a damages remedy for non-constitutional torts committed by federal officers—is subject to a long list of express "exceptions," including some that explicitly codify pre-existing or common-law immunities. *See* 28 U.S.C. § 2680. Similarly, the Supreme Court has repeatedly explained that express "sue-and-be-sued" clauses waiving sovereign immunity for certain federal entities must be "liberally construed" to avoid imposing unwelcome "implied restriction[s]" on Congress' legislative judgment to offer compensatory damages. *Thacker v. Tenn. Valley Auth.*, 139 S. Ct. 1435, 1141 (2019). Those cases recognize that Congress "generally intend[s] the full consequences of what it sa[ys]." *Id.* (citation and quotation omitted).

The Supreme Court's skeptical approach to extending *Bivens* reflects the inverse of the same basic principle. In that context, the Court has instructed that

Congress is the proper branch of government to make policy judgments and calibrate remedies: "'Congress is in a far better position than a court to evaluate the impact of a new species of litigation' against those who act on the public's behalf. And Congress can tailor any remedy to the problem perceived." *Wilkie v. Robbins*, 551 U.S. 537, 562 (2007) (quoting *Bush v. Lucas*, 462 U.S. 367, 389 (1983)). In other words, the "substantial responsibility to determine whether, *and the extent to which,* monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government" is entrusted to Congress, not the courts. *Ziglar*, 137 S. Ct. at 1856 (emphasis added).

RFRA's express damages remedy is an example of Congress exercising that prerogative to determine that those harmed by a statutory violation *should* be compensated. And with Congress having taken that step, its omission of any qualified immunity defense from the statute is significant—it reflects a purposeful choice by Congress that courts must respect. *See Tanzin*, 141 S. Ct. at 492 ("Had Congress wished to limit the remedy to that degree, it knew how to do so."). As *Tanzin* explained, damages are "the *only* form of relief that can remedy some RFRA violations," so "it would be odd to construe RFRA in a manner that prevents courts from awarding such relief." *Id.*[4]

---

[4] After making this observation and stressing the importance of heeding RFRA's "textual cues," *Tanzin* also mentioned in a footnote that the parties in that case had

Importing a qualified immunity defense to RFRA would thus result "not [in] a construction of [the] statute, but in effect, an enlargement of it by the court, so that what was omitted . . . may be included." *Lamie v. U.S. Trustee*, 540 U.S. 526, 538 (2004) (quoting *Iselin v. United States*, 270 U.S. 245, 251 (1926)). That is especially true given that qualified immunity is a powerful and ubiquitously invoked defense that carries the potential to nullify Congress's remedy in a broad swath of cases. Just as Congress does not "hide elephants in mouseholes," *see Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001), it surely does not smuggle elephants in silence.

The structure and context of the statute confirms that Congress' omission of qualified immunity from RFRA was a purposeful judgment. To begin with, the statute's core operative provision is emphatic and categorical. It directs that "Government *shall not* substantially burden a person's exercise of religion even if the burden results from a rule of general applicability. . ." 42 U.S.C. § 2000bb–1(a) (emphasis added). It then specifies that the sole "[e]xception" is when the government demonstrates that the "the burden of the person—(1) is in furtherance

_____

not disputed the question whether qualified immunity would apply to the cause of action, *see Tanzin*, 141 S. Ct. at 492 n. *, thereby making clear that the question was neither presented in that case nor resolved by the Court's decision.

of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* § 2000bb–1(b). Where the statute's prohibition is violated and its exception is not met, RFRA promises a remedy: "A person whose religious exercise has been burdened in violation of this section may assert that violation . . . in a judicial proceeding and obtain appropriate relief . . ." 42 U.S.C. § 2000bb–1(c).[5]

Moreover, "Congress enacted RFRA in order to provide greater protection for religious exercise than is available under the First Amendment." *Holt v. Hobbs*, 574 U.S. 352, 357 (2015). By overriding *Employment Division v. Smith*, 494 U.S. 872 (1990), and codifying the compelling interest test of earlier caselaw, *see* 42 U.S.C. § 2000bb, RFRA effectuated "a complete separation from First Amendment case law." *Burwell*, 573 U.S. at 696. RFRA declares its purpose "to guarantee" the new extraconstitutional test "in *all* cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b)(1) (emphasis added). And Congress even mandated that RFRA "'be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by [its] terms.'" *Burwell*, 573 U.S. at 696 (quoting 42 U.S.C. § 2000cc–3(g)). These strong remedial purposes corroborate that

---

[5] RFRA's function of making even some "neutral" actions that burden religion unlawful, also demonstrates the deep protection the statute was meant to provide: "Laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise." 42 U.S.C. § 2000bb(a)(2).

Congress would not have wanted the sweeping defense of qualified immunity to counteract the statute.

The district court had no sound basis for concluding otherwise. It recognized that this Court's precedent has not extended qualified immunity to RFRA, but followed other cases seeming to do so. S*ee* 1 J.A. 13. But the cases that the district court relied on when extending qualified immunity to RFRA contain little or no reasoned analysis. *See* 1 J.A. 13 (citing *Njos v. Carney*, No. 3:12-CV-01375, 2017 WL 3224816, at *8 (M.D. Pa. June 21, 2017) (collecting cases), which then cites *Davila v. Gladen*, 777 F.3d 1198, 1209 (11th Cir. 2015); *Walden v. Ctrs. for Disease Control & Prevention*, 669 F.3d 1277, 1285 (11th Cir. 2012); *Lebron v. Rumsfeld*, 670 F.3d 540, 557 (4th Cir. 2012); *Weinberger v. Grimes*, No. 07–6461, 2009 WL 331632, at *5 (6th Cir. Feb. 10, 2009)).[6] And a number of other courts cite *Harlow*'s "clearly established statutory or constitutional rights" language as justification for applying qualified immunity to RFRA claims.[7] But, as explained above, *Harlow* does not support extending qualified immunity to RFRA or other express damages

---

[6] *See also Rasul v. Myers*, 563 F.3d 527, 533 n.6 (D.C. Cir. 2009) (per curiam) (applying qualified immunity to a RFRA claim for "the reasons stated in" a vacated prior opinion, which concluded that plaintiff "waived any argument to the contrary" and noted "some uncertainty about whether qualified immunity is available to federal officials sued under RFRA," 512 F.3d 644, 676 n.5 (Brown, J., concurring)).

[7] *See, e.g.*, *Pauley ex rel. Asatru/Odinist Faith Cmty. v. Samuels*, No. 1:15-cv-158, 2019 WL 4600195, at *11, *12 n.10 (W.D. Pa. Sept. 23, 2019); *Romero v. Lappin*, No. 10-cv-35, 2011 WL 3422849, at *2 (E.D. Ky. Aug. 4, 2011); *Harrison v. Watts*, 609 F. Supp. 2d 561, 574–75 (E.D. Va. 2009).

remedies because *Harlow* concerned only *implied* rights of action. *See supra*, at 14–15.

Moreover, such cursory treatment overlooks the key differences among Section 1983, *Bivens*, and typical federal statutes. From a distinct historical backdrop, Section 1983 created an entire new species of constitutional torts against state officials; it is characterized by its "broad[]" ambitions and open-ended "general language." *Monroe*, 365 U.S. at 174, 183. Thus, Courts have assumed an "unusual" central role in implementing the statute and filling in its contours. *See* Eskridge, *supra,* at 1054. That role has included creating and expanding the doctrine of qualified immunity, which—though much-criticized, *see infra*, Part II.C—at least has some grounding in the common law at the time of Section 1983's enactment. *See Pierson*, 366 U.S. at 556; *Buckley*, 509 U.S. at 268.

The rules of engagement, however, are quite different when dealing with modern congressional statutes that are focused on bounded subject matter and elaborate on their intended operation in the text. When interpreting this kind of legislation, the judiciary does not have the same latitude to fashion rules and add defenses, particularly when doing so would rob the statute of its stated intention by inserting an unwritten exemption from liability that would be available "to all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341.

Courts have recognized and honored this limitation on qualified immunity in the context of comparable legislation, namely the False Claims Act (FCA)'s anti-retaliation provision, 31 U.S.C. § 3730(h). *See Samuel v. Holmes*, 138 F.3d 173, 178 (5th Cir. 1998). *Holmes* refused to extend qualified immunity to claims arising under § 3730(h) because the doctrine "seems particularly ill-suited in this context" and "appears inconsistent with the purposes behind the statute." *Id*. at 178–79; *see also Bell v. Dean*, No. 2:09-cv-1082, 2010 WL 2976752, at *2 (M.D. Ala. July 27, 2010) (holding the same because "applying the judicially created doctrine of qualified immunity to bar [damages] would seem at odds with [§ 3730(h)'s] purpose"). For all the reasons discussed here, that logic applies with even greater force to RFRA. To read in such a sweeping defense to the RFRA's categorical protections would eviscerate the statute and upend the separation of powers.

### C. Even in the contexts where it already applies, modern qualified immunity doctrine has been widely criticized.

Should the court harbor any doubt on this score, mounting criticisms of the qualified immunity doctrine are good reason to err against extending qualified immunity even further into RFRA. Since *Harlow*, qualified immunity has drifted further into "freewheeling policy choice," *Malley*, 475 U.S. at 342, unmoored from the common-law antecedents of Section 1983. That drift has led to sustained criticism of the doctrine.

To begin with, the policy justifications that fueled the expansion of the doctrine have been undermined by experience. Modern qualified immunity doctrine is primarily justified by the purported need to protect officials from financial liability to avoid chilling the exercise of their duties. *See, e.g.*, *Scheuer*, 416 U.S. at 240. The theory is that "[w]hen officials are threatened with personal liability for acts taken pursuant to their official duties, they may well be induced to act with an excess of caution or otherwise to skew their decisions." *Forrester v. White*, 484 U.S. 219, 223 (1988). Where these policy considerations seemed not to be implicated, the Court has declined to extend the defense. *See Richardson v. McKnight*, 521 U.S. 399, 411 (1997); *Owen*, 445 U.S. at 654.

As it turns out, these policy concerns are not empirically valid even where qualified immunity already *does* apply. The reason is the nearly universal practice of indemnifying government employees, which means that individual officials are almost never financially responsible. As Professor Joanna C. Schwartz found in one recent wide-ranging empirical study, "officers financially contributed to settlements and judgments in just .41% of . . . civil rights damages actions resolved in plaintiffs' favor, and their contributions amount to just .02%" of the damages paid. Joanna C. Schwartz, *Police Indemnification*, 89 N.Y.U. L. Rev. 885, 890, 912–13, 936–37 (2014). In 37 smaller jurisdictions tracked in the study, officers "never contributed to settlements or judgments in lawsuits brought against them." *Id.* at 890. In most

jurisdictions, "officers are more likely to be *struck by lightning* than they are to contribute to a settlement or judgment." *Id.* at 914 (emphasis added).[8]

Moreover, the original common-law justifications for applying qualified immunity under Section 1983 similarly have been called into doubt. The historical record reveals that "lawsuits against officials for constitutional violations did not generally permit [even] a good-faith defense during the early years of the Republic." Baude, *supra*, at 55–58. Instead, a subjective good faith test existed for only some claims and even that subjective test bears no relation to the objective test invented by *Harlow*. *See* Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. 1797, 1802 (2018). To the extent 19th Century common law included any protections vaguely akin to qualified immunity, the defenses were incorporated into the *elements* of a particular tort. *See, e.g., The Marianna Flora*, 24 U.S. (11 Wheat.) 1 (1826). "This distinction is important because an element of a specific tort does not provide evidence of a more general backdrop that one would expect to export to other claims, let alone from common law to constitutional claims." Baude, *supra*, at 59. In other words, it has become increasingly clear that even *at common*

---

[8] The same is true of prison officials. "[I]n nearly all inmate litigation, it is the correctional agency that pays both litigation costs and any judgments or settlements, even though individual officers are the nominal defendants." Margo Schlanger, *Inmate Litigation*, 116 Harv. L. Rev. 1555, 1675–76 (2003).

*law* there was no freestanding defense or blanket immunity doctrine anything like modern qualified immunity.

For those reasons—and because our legal system rests on the premise that "where there is a legal right, there is also a legal remedy," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803)—a growing chorus of jurists have recognized serious problems with modern qualified immunity and have questioned the doctrine's continued viability. *See, e.g.*, *Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting) (qualified immunity has become "an absolute shield for law enforcement officers"); *Ziglar*, 137 S. Ct. at 1871 (Thomas, J., concurring in part and concurring in the judgment) ("[W]e have diverged from the historical inquiry mandated by the statute."); *Crawford-El v. Britton*, 523 U.S. 574, 611 (1998) (Scalia, J., dissenting) ("[O]ur treatment of qualified immunity . . . has not purported to be faithful to the common-law immunities that existed when § 1983 was enacted . . ."); *Wyatt v. Cole*, 504 U.S. 158, 170 (1992) (Kennedy, J., concurring) ("In the context of qualified immunity . . . we have diverged to a substantial degree from the historical standards."); *Horvath v. City of Leander*, 946 F.3d 787, 801 (5th Cir. 2020) (Ho, J., concurring) ("[T]here is no textualist or originalist basis to support a 'clearly established' requirement in § 1983 cases"); *Zadeh v. Robinson*, 902 F.3d 483, 498 (5th Cir. 2018) (Willett, J., concurring) ("I write separately to register my disquiet over the kudzu-like creep of the modern

immunity regime. Doctrinal reform is arduous … But immunity ought not be immune from thoughtful reappraisal."); *Jamison v. McClendon*, 476 F. Supp. 3d 386, 423 (S.D. Miss. 2020) (Reeves, J.) ("Just as the Supreme Court swept away the mistaken doctrine of 'separate but equal,' so too should it eliminate the doctrine of qualified immunity.").[9]

The court-created doctrine of qualified immunity has been stretched to a breaking point. Courts should be reluctant to extend it still further, into RFRA or anywhere else. To be sure, this Court must adhere to precedent. But these weighty criticisms of existing qualified immunity doctrine are good reason to hesitate before extending it into an unwarranted new domain like RFRA. After all, courts should be loath to expand "disfavored" doctrine into new domains, especially when Congress has not expressly endorsed that choice. *See Ziglar*, 137 S. Ct. at 1857.

## CONCLUSION

For the foregoing reasons, the decision below should be reversed.

---

[9] The doctrine has also received extensive criticism from scholars, *see, e.g.*, Baude, *supra*, at 55–58; Schwartz, *The Case Against Qualified Immunity*, *supra*, at 1802; Diana Hassel, *Excessive Reasonableness*, 43 Ind. L. Rev. 117, 118–119 (2009); John S. Jeffries, Jr., *The Right-Remedy Gap in Constitutional Law*, 109 Yale L.J. 89, 89 (1999), as well as from organizations across the ideological spectrum, *see, e.g.*, Jay Schweikert, *Qualified Immunity: A Legal, Practical, and Moral Failure*, Cato Inst., (Sept. 14, 2020), https://www.cato.org/policy-analysis/qualified-immunity-legal-practical-moral-failure; *Qualified Immunity*, Equal Justice Initiative, https://eji.org/issues/qualified-immunity (last visited Nov. 8, 2021).

Date:  November 16, 2021

Respectfully submitted,

*s/ Michael Skocpol*

SAMUEL WEISS
RIGHTS BEHIND BARS
416 Florida Avenue NW, #26152
Washington, DC 20001
(202) 455-4399

MICHAEL SKOCPOL
CHRISTOPHER KEMMITT
NAACP LEGAL DEFENSE AND
    EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 682-1300

SAMUEL SPITAL
ADAM MURPHY
NAACP LEGAL DEFENSE AND
    EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 29(a)(5) because it contains 6,356 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Third Circuit Local Appellate Rules 46.1(e) and 28.3(d), I hereby certify that all attorneys whose names appear on this brief are members in good standing of the United States Court of Appeals for the Third Circuit.

## CERTIFICATE OF VIRUS SCAN

Pursuant to Third Circuit Local Appellate Rule 31.1(c), I hereby certify that a Webroot virus detection scan was run on the file containing the electronic version of this brief, and no viruses were detected.

## CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEFS

Pursuant to Third Circuit Local Appellate Rule 31.1(c), I hereby certify that the text of the electronic brief is identical to the text in the paper copies.

Date: November 16, 2021

*s/ Michael Skocpol*  
Michael Skocpol

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing *amicus curiae* brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system on November 16, 2021. Additionally, seven hard copies of the brief were shipped to the Clerk's Office for overnight delivery by a third-party commercial carrier.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Date: November 16, 2021

*s/ Michael Skocpol*
Michael Skocpol